# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION  II

| | |
|---|---|
| STATE OF WASHINGTON, | No.  54029-1-II |
| Respondent, | |
| v. | |
| ZYION DONNTISTE HOUSTON-SCONIERS, | UNPUBLISHED OPINION |
| Appellant. | |

SUTTON, J. — Zyion Houston-Sconiers appeals his convictions for unlawful possession of a firearm and unlawful possession of a controlled substance (UPCS) with a firearm enhancement. Houston-Sconiers argues that the trial court erred by denying his CrR 3.6 motion to suppress evidence found during the search of a vehicle.  He also argues that he received ineffective assistance of counsel during the CrR 3.6 hearing.  Further, Houston-Sconiers argues that the trial court erred by denying his motion to exclude an officer's testimony based on a violation of ER 615.  Finally, Houston-Sconiers argues that his conviction for UPCS with a firearm enhancement must be reversed under *State v. Blake*.[1]  In his statement of additional grounds (SAG), Houston-Sconiers argues that the trial court erred by failing to require defense counsel to certify that he complied with the applicable standard for indigent defense services, and the police violated Houston-Sconiers' constitutional rights by failing to properly read him his *Miranda*[2] rights.

---

[1] 197 Wn.2d 170, 481 P.3d 521 (2021).

[2] *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

Houston-Sconiers' claims related to the CrR 3.6 order, ineffective assistance of counsel, and ER 615 fail. The claims raised in his SAG also fail. Thus, we affirm Houston-Sconiers' conviction for unlawful possession of a firearm. However, the conviction for UPCS must be remanded under *Blake*. Therefore, we remand to the trial court to vacate the UPCS with a firearm enchantment conviction, and for resentencing.

## FACTS

### I. FACTUAL BACKGROUND

During a traffic stop, police officers found heroin and a firearm in Houston-Sconiers' backpack. The State charged Houston-Sconiers by amended information with one count of unlawful possession of a firearm in the first degree and one count of unlawful possession of a controlled substance (heroin) with intent to deliver with a firearm enhancement.

### II. CRR 3.6 HEARING

The trial court held a CrR 3.6 hearing based on Houston-Sconiers' motion to suppress all evidence found in the vehicle. Houston-Sconiers argued that the *Terry*[3] stop of the vehicle was pretextual, was conducted for purposes of criminal investigation, and was not justified by a reasonable and articulable suspicion of criminal activity. The court heard the following evidence at the hearing:

In November 2018, Tacoma Police Department Sergeant David Johnson worked in the Department's gang unit with an emphasis on street crimes and also worked undercover in the

---

[3] *Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868, 20 L.Ed.2d 889 (1968).

Tacoma Hilltop area.[4] At that time, the unit was working with uniformed patrol officers, McNelly, Munn, and Bradley, who were assisting one to two times a month prior to their regular duty shift, working in marked patrol cars.

Near the end of his shift, Sergeant Johnson was watching a car at a gas station with a history of being used for drug transactions. Officers McNeely, Munn, and Bradley were positioned out of the line of sight. Sergeant Johnson observed two vehicles on the south side of the gas station: a blue Buick and a Cadillac. Sergeant Johnson saw the Cadillac park at the gas station for approximately 20 minutes with none of the occupants leaving the car to pump gas or enter the associated store. Two other vehicles in the parking lot had occupants that similarly did not conduct business with the gas station, but interacted with the occupants of the Cadillac. A person later identified as Tayvion Johnson was standing outside the Buick, talking to an occupant of the Buick. Tayvion then got into the front passenger seat of the Cadillac. A blue Chevrolet Trailblazer then pulled into the lot and parked next to the Cadillac. A person later identified as Houston-Sconiers exited the Trailblazer and approached Tayvion in the Cadillac.

Sergeant Johnson observed the two men enter the Cadillac, and he saw movement inside the vehicle. Houston-Sconiers returned to the Trailblazer, pulled a backpack from the Trailblazer, returned to the Cadillac, and got into the right backseat of the Cadillac with the backpack. The back and side windows of the Cadillac were tinted, so Sergeant Johnson was unsure if he was able to see any other people in the back of the vehicle.

---

[4] Many of the cited facts are from the trial court's undisputed findings of fact.

Sergeant Johnson radioed the Cadillac's license plate number to the other officers who were familiar with the Cadillac's registered owner, Cubean. He observed the Cadillac leave the gas station and head towards an exit from the parking lot. Sergeant Johnson believed there was insufficient suspicious activity to justify contacting the Cadillac at that time and stopped his surveillance of it. He then observed it make a sharp turn and return to the west side of the gas station parking lot. Houston-Sconiers jumped out of the back of the Cadillac and began waving his arms and screaming at Sergeant Johnson. He then started to approach Sergeant Johnson's vehicle. While the door of the Cadillac was open, Sergeant Johnson was able to see a female inside who matched the description of the registered owner. He radioed his observations and left the area. The Cadillac pulled out of the parking lot, and began traveling eastbound down the street. Officers McNeely, Munn, and Bradley all confirmed the registered owner of the Cadillac was Cubean and determined that her driver's status as No Valid Operator's License (NVOL), but that she was eligible for a driver's license. The officers decided to conduct a traffic stop of Cubean.

Officer McNeely was aware of Cubean from previous encounters and knew she was associated with known gang members. Officer McNeely decided to follow up with the traffic violation. Officers Bradley and Munn also knew Cubean from a previous encounter, so they assisted Officer McNeely.

The officers followed Cubean in separate marked patrol cars. Officer McNeely was in the first vehicle behind Cubean's car, followed by Officer Munn. Cubean pulled over and parked before Officer McNeely activated his patrol car's light bar. Before Cubean stopped, Officer McNeely recognized Tayvion Johnson as the front seat passenger as he had arrested Tayvion a few months prior to this incident.

4

Before exiting his patrol car, Officer Munn observed Cubean "reach[] over Tayvion, towards the area of the glove[ ]box." Clerk's Papers (CP) at 174; Verbatim Report of Proceedings (VRP) (April 18, 2019) at 152. At the same time, Officer Munn observed Tayvion leaning forward and looking around. Officer Munn observed both Tayvion and Cubean reach for the glove box. Based on these movements and his prior knowledge of Cubean and Tayvion, Officer Munn approached the vehicle with his gun drawn against his leg. Officer McNeely exited his vehicle; contacted Cubean; and asked for her license, registration and proof of insurance. Cubean did not have a license, but she presented a valid state identification. Officer McNeely went back to his patrol car to process the traffic infraction. On his way back, he noticed that Houston-Sconiers was not wearing a seatbelt and asked him to identify himself, which he did. Officer McNeely also asked Cubean to continue looking for her registration.

When Officer Bradley approached the vehicle, Tayvion informed him that he was a member of the Crips. Officer Bradley then recognized Houston-Sconiers in the backseat, having previously met him when Officer Bradley contacted a group of individuals for smoking marijuana in public.

While Officer McNeely ran routine records check, Officer Munn asked Cubean numerous times if she kept her registration in her glove box, as she was nervously looking around for it. Officer Munn suggested Cubean check the glovebox for her registration, and Cubean replied that she did not have it and could not look in there. Officer Munn asked Cubean if the glove box was locked, and Cubean replied that it was not. Officer Munn became concerned that she had a weapon in the glove box due to her nervousness and unwillingness to open the glove box, as well as her known association with gang members.

After Officer McNeely verified Cubean's identification, he decided to issue her an infraction ticket, and he returned to the vehicle. While Officer McNeely was speaking with Cubean, Officer Munn opened the glove box and found a firearm. He then closed the glove box and directed the other officers to detain Cubean and Tayvion. Officer Munn knew that Tayvion could not legally possess a firearm because he had prior felony convictions and Cubean could not legally possess the firearm in the glove box because she did not have a concealed pistol license.

The officers removed all three occupants from the vehicle, including Houston-Sconiers. The officers gave all three occupants both *Miranda* and *Ferrier*[5] warnings. After the warnings were given, all three occupants voluntarily consented to the officers searching the vehicle.

The officers searched the vehicle and located a camouflage backpack on the floor of the vehicle next to where Houston-Sconiers had been sitting. The backpack contained a loaded semi-automatic handgun with a round in the chamber and prescription bottles with Houston-Sconiers' name on them. After the officers found the firearm, Houston-Sconiers withdrew his consent for the officers to continue their search. At this point, the officers stopped their search and applied for and obtained a search warrant. Following the search authorized by the warrant, the officers found black tar heroin in the backpack but no drug paraphernalia.

Houston-Sconiers contested the validity of the stop and a CrR 3.6 hearing was held. Following the hearing, the trial court found the *Terry* stop was justified by reasonable and articulable suspicions, and officer safety concerns and consent justified the scope of the search. The trial court found:

---

[5] *State v. Ferrier*, 136 Wn.2d 103, 118, 960 P.2d 927 (1998).

The police validly stopped the Cadillac, having a reasonable articulable suspicion that Brianna Cubean had committed a traffic infraction, if not a traffic misdemeanor. While they may have had other motivations in stopping the Cadillac, it was a mixed-motive stop valid under *State v. Arreola*,[6] rather than a pretextual stop under *State v. Ladson*.[7]  The No Valid Operator's License violation was an actual, conscious, and independent cause of the stop.  The police actually, consciously, and independently determined that the traffic stop for that reason was reasonably necessary in furtherance of traffic safety and general welfare.  Police need not ignore an actual violation, as long as discretion is properly exercised.

When Brianna produced a valid state identification, but no driver's license, Officer McNeely was entitled to cite her for No Valid Operator's License.

The stop was properly expanded to allow Officer Munn to open and look into the glove[ ]box, as he had a reasonable articulable suspicion of the presence of a weapon in the glove[ ]box.  His concern for officer safety was reasonable in light of the totality of the following circumstances:

1) Brianna's movements at the time of the stop,

2) Tayvion's movements at the time of the stop,

3) known connection between Brianna and known gangmembers [sic],

4) Tayvion's gang involvement and criminal history,

[5]) Brianna's statements related to the glove[ ]box, to include a claim that she could not check the glove[ ]box for her registration, despite it being unlocked,

[6]) Brianna's nervous manner while speaking to the officer.

The discovery of the firearm in the glove[ ]box properly expanded the valid scope of the stop into a criminal investigation.  By that time, the officer had determined the defendant also had a violent felony history.  None of the occupants of the Cadillac could have lawfully possessed that firearm.  Additionally, the gun being in the glove[ ]box was a crime.

---

[6] 176 Wn.2d 284, 297, 290 P.3d 983 (2012).

[7] 138 Wn.2d 343, 358, 979 P.2d 833 (1999).

The police then obtained valid consent to search the Cadillac. The totality of the circumstances demonstrate that Brianna, as the registered owner voluntarily, intelligently and knowingly allowed the officers to search the Cadillac, with the exception of the stripper bag[8] in the backseat. The totality of the circumstances demonstrate that the defendant also voluntarily, intelligently and knowingly allowed the officers to search the Cadillac.

There was no violation of Article 1, Section 7 of the Washington [S]tate [C}onstitution. The evidence sought to be suppressed is admissible as having been discovered as set out above, and through a warrant based upon probable cause.

CP at 176-78.

### III. BENCH TRIAL

The case proceeded to a bench trial. During trial, after the officers testified, defense counsel moved to exclude Officer Munn's testimony under ER 615, arguing that the officers had violated the court order under ER 615 by discussing their testimony with each other. He implied that Officers Munn and McNeely had been talking about the tinted windows in the hallway of the courthouse. Houston-Sconiers' wife said she had overheard them talking on the day of trial, and heard the word "tints." VRP (July 16, 2019) at 550. Defense counsel argued that this violated the court order that "all witnesses remain outside the courtroom until they have been called." CP at 200; VRP (July 16, 2019) at 547-48.

The trial court took testimony on this issue. Officer Munn and the other officer testified that they were not discussing Houston-Sconiers' case. The court denied the motion and found that there was neither evidence of collusion nor evidence of Officer Munn violating a court order. The court stated:

---

[8] This was a bag in the backseat separate from the backpack at issue here.

> [T]he record before me does not demonstrate that there has been a violation of ER 615, and I say that for a couple of reasons. One is we have contrary evidence about what was said in the – out in the lobby, or in the hallway entrance to this court. And I don't disbelieve that Ms. Wood heard something that occurred between the two officers, and both officers indicated they were talking to each other out in the hallway. However, what has been put before this Court is but a snippet of that conversation, and not enough for this Court to find that there was any inconsistencies or collusion between the witnesses.

VRP (July 17, 2019) at 626-27.

Following the trial, the court found Houston-Sconiers guilty of unlawful possession of a firearm in the first degree under count I; UPCS, the lesser included offense for count II; and a firearm enhancement. The trial court entered findings of fact and conclusions of law.

## IV. POST-TRIAL

Houston-Sconiers filed a motion to vacate the trial court's findings and conclusions regarding the CrR 3.6 motion to suppress, arguing similar arguments as before, and that he had received ineffective assistance of counsel because his defense counsel had failed to adequately investigate and present evidence regarding whether the officers could see inside the vehicle. The trial court denied this motion, stating in its order that "[t]here is no reasonable probability that the result of the CrR 3.6 hearing would have been different had [defense counsel] performed as current defense counsel argues she should have performed." CP at 305.

The court imposed 100 months plus a 36-month enhancement for the firearm enhancement, plus 12 months of community custody.

Houston-Sconiers appeals.

9

ANALYSIS

I. MOTION TO SUPPRESS

Houston-Sconiers argues that the trial court erred by denying his CrR 3.6 motion to suppress because the vehicle stop was pretextual in violation of the Fourth Amendment of the United States Constitution and article 1, section 7 of the Washington Constitution; Officer Munn illegally expanded the scope of the stop to search the glove box and illegally seized Houston-Sconiers; the unlawful search and unlawful seizure were not justified by officer safety issues or based on voluntary consent; and the occupants of the car were not lawfully removed.[9, 10] We hold that Houston-Sconiers' arguments fail, and the trial court did not err by denying the CrR 3.6 motion to suppress.

A. LEGAL PRINCIPLES

Both the Fourth Amendment to the United States Constitution and article 1, section 7 of the Washington Constitution require an officer to obtain a warrant before seizing an individual unless an exception to the warrant requirement applies. *State v. Weyand*, 188 Wn.2d 804, 811, 399 P.3d 530 (2017). One such exception allows an officer to conduct a brief investigative stop known as a *Terry* stop. *State v. Z.U.E.*, 183 Wn.2d 610, 617, 352 P.3d 796 (2015).

---

[9] Houston-Sconiers challenges the CrR 3.6 findings of fact (FF) regarding mixed motive, reasonable articulable suspicion, expanded scope, and valid consent. He also challenges the findings from the bench trial regarding the warrantless search of the glove box (FF VII), consent (FF IX), the gun was easily accessible for use (FF XIII), and the conclusion that the guns and drugs were found in the backpack next to him (FF III).

[10] In his supplemental briefing, Houston-Sconiers also argues that the stop was pretextual under *Blake*. However, *Blake* is irrelevant to determining whether a traffic stop is pretextual because *Blake* only held that the statute criminalizing simple possession is unconstitutional. 197 Wn.2d at 195.

A *Terry* stop is permissible if the "officer has a reasonable suspicion, grounded in specific and articulable facts, that the person stopped has been or is about to be involved in a crime." *State v. Acrey*, 148 Wn.2d 738, 747, 64 P.3d 594 (2003). Article 1, section 7 of the Washington Constitution provides broader protections than the Fourth Amendment and generally requires that the available facts "substantiate more than a mere generalized suspicion that the person detained is 'up to no good.'" *Z.U.E.*, 183 Wn.2d at 618 (quoting *State v. Bliss*, 153 Wn. App. 197, 204, 222 P.3d 107 (2009)). "[T]he facts must connect the particular person to the *particular crime* that the officer seeks to investigate." *Z.U.E.*, 183 Wn.2d at 618.

"When reviewing the merits of an investigatory stop, a court must evaluate the totality of circumstances presented to the investigating officer." *State v. Glover*, 116 Wn.2d 509, 514, 806 P.2d 760 (1991). Among the factors to consider when evaluating whether the stop was proper are the officer's training and experience, the location of the stop, and the conduct of the detainee. *Acrey*, 148 Wn.2d at 747. To an extent, reasonableness of the stop depends on the seriousness of the suspected criminal conduct. *State v. McCord*, 19 Wn. App. 250, 253, 576 P.2d 892 (1978). The State bears the burden of proving the legality of a warrantless seizure by clear and convincing evidence. *State v. Rawley*, 13 Wn. App. 2d 474, 479, 466 P.3d 784 (2020).

"In reviewing the denial of a motion to suppress, we review the trial court's conclusions of law de novo and its findings of fact used to support those conclusions of law for substantial evidence." *State v. Fuentes*, 183 Wn.2d 149, 157, 352 P.3d 152 (2015). Substantial evidence is evidence sufficient to persuade a fair-minded, rational person of their truth. *State v. Levy*, 156 Wn.2d 709, 733, 132 P.3d 1076 (2006). However, we "'will review only those facts to which error has been assigned.'" *State v. Ross*, 141 Wn.2d 304, 309, 4 P.3d 130 (2000) (quoting *State v. Hill*,

11

123 Wn.2d 641, 647, 870 P.2d 313 (1994)).  If the defendant does not challenge the findings of fact, we consider them verities on appeal.  *State v. Betancourth*, 190 Wn.2d 357, 363, 413 P.3d 566 (2018).

B.  PRETEXTUAL STOP

Houston-Sconiers argues that the traffic stop was pretextual.  We hold that the traffic stop was not pretextual and was lawful.

Under article 1, section 7, pretextual traffic stops are unconstitutional.  *State v. Ladson*, 138 Wn.2d 343, 358, 979 P.2d 833 (1999); CONST. art. I, § 7.  A traffic stop is pretextual when an officer relies on some legal authorization as "a mere pretext to dispense with [a] warrant when the true reason for the seizure is not exempt from the warrant requirement."  *Ladson*, 138 Wn.2d at 358.  Our Supreme Court in *Ladson* explained, "[T]he problem with a pretextual traffic stop is that it is a search or seizure which cannot be constitutionally justified for its true reason (i.e., speculative criminal investigation), but only for some other reason (i.e., to enforce traffic code) which is at once lawfully sufficient but not the real reason."  138 Wn.2d at 351.

When determining whether a stop is pretextual, we consider the totality of the circumstances, including the subjective intent of the officer and the objective reasonableness of the officer's behavior.  *Ladson*, 138 Wn.2d at 358-59.  "When an unconstitutional search or seizure occurs, all subsequently uncovered evidence becomes fruit of the poisonous tree and must be suppressed."  *Ladson*, 138 Wn.2d at 359.

Pretextual stops "'generally take the form of police stopping a driver for a minor traffic offense to investigate more serious violations—violations for which the officer does not have probable cause.'"  *State v. Quezadas-Gomez*, 165 Wn. App. 593, 600-01, 267 P.3d 1036 (2011)

(quoting *State v. Myers*, 117 Wn. App. 93, 94-95, 69 P.3d 367 (2003)). "[A] traffic stop is not unconstitutionally pretextual so long as investigation of either criminal activity or a traffic infraction (or multiple infractions), for which the officer has a reasonable articulable suspicion, is an actual, conscious, and independent cause of the traffic stop." *State v. Arreola*, 176 Wn.2d 284, 297, 290 P.3d 983 (2012). A mixed motive stop does not violate article 1, section 7 if the police officer making the stop exercises discretion appropriately. Thus, if a police officer makes an independent and conscious determination that a traffic stop to address a suspected traffic infraction is reasonably necessary to further traffic safety and the general welfare, the stop is not pretextual. That remains true even if the legitimate reason for the stop is secondary and the officer is motivated primarily by a hunch or some other reason that is insufficient to justify a stop. *Arreola*, 176 Wn. 2d at 298-99.

Here, the trial court found that the officers had more than one motive for the *Terry* stop. The officers were motivated by the NVOL, Cubean's association with gang members, and their suspicion of Houston-Sconiers' backpack. The court found that the NVOL was an "actual, conscious, and independent cause of the stop." CP at 177.

The officers who conducted the traffic stop did so in order to enforce the NVOL law. They had reasonable suspicion based on their license check to believe that Cubean did not have a valid driver's license. These officers were not part of the gang unit that had initially radioed in the description and set up the surveillance of the area at issue; rather, they were officers regularly assigned to patrol traffic violations and were in uniform at the time. Accordingly, they were acting within their normal course of duty to conduct a *Terry* stop in order to enforce the NVOL law. Officer McNeely asked Cubean for her license and registration, confirmed that she did not have a

valid driver's license, and was preparing to issue a citation. This was a proper mixed motive stop and did not violate Houston-Sconiers' constitutional rights.

Based on the totality of the circumstances, the officers had reasonable and articulable reasons for the *Terry* stop. There is substantial evidence that the stop here was a mixed motive stop and that NVOL was a valid reason for such a stop. Therefore, the trial court did not err in finding a mixed motive stop.

C. THE DETENTION WAS REASONABLE IN SCOPE

Houston-Sconiers argues that even if the initial stop of the vehicle was justified, his detention exceeded the legitimate scope of the *Terry* stop. We hold that the officers did not exceed the scope of the *Terry* stop and his detention was reasonable.

"[A] warrantless search must be 'strictly circumscribed by the exigencies which justify its initiation.'" *Mincey v. Arizona*, 437 U.S. 385, 393, 98 S. Ct. 2408, 57 L. Ed. 2d 290 (1978) (quoting *Terry v. Ohio*, 392 U.S. 1, 25-26, 88 S. Ct. 1868, 20 L. Ed. 2d 8889 (1968)). Whether an officer has exceeded the scope of a *Terry* stop is a fact-specific inquiry. *State v. Wheeler*, 43 Wn. App. 191, 195, 716 P.2d 902 (1986). The stop must last no longer than necessary and employ the least intrusive means available to verify or dispel the reasonable suspicion. *Florida v. Royer*, 460 U.S. 491, 500-01, 103 S. Ct. 1319, 75 L. Ed. 2d 229 (1983). Similar to the analysis for determining the validity of the *Terry* stop, the proper scope of a *Terry* stop depends on "the purpose of the stop, the amount of physical intrusion upon the suspect's liberty, and the length of time the suspect is detained." *State v. Williams*, 102 Wn.2d 733, 740, 689 P.2d 1065 (1984). An officer must release the individual if the initial results of the stop dispel the officer's suspicions, but results of the stop

that confirm the suspicions or arouse further suspicions permit an extended seizure. *Acrey*, 148 Wn.2d at 747.

Here, Officer Munn already had reasonable suspicion that the vehicle's occupants possessed weapons as he approached the vehicle because he saw furtive movements inside the car that appeared to be people reaching for weapons near the glove box. Officer Munn asked Cubean if her registration for the car was in her glove box, and he asked her to check. Cubean exhibited nervousness when asked multiple times to check her glove box, making Officer Munn more suspicious that she was keeping a weapon in there. Cubean did not check the glove box for the registration even though it was unlocked and Officer Munn requested she do so.

Officer Munn's actions did not improperly expand the legitimate scope of the *Terry* stop. This was not an intrusive means for Officer Munn to verify or dispel his suspicions about a weapon being in the glove box. *See Florida*, 460 U.S. at 500. Accordingly, we hold that Officer Munn did not impermissibly expand the scope of the *Terry* stop.

D. SAFETY CONCERNS AND PROTECTIVE SWEEP OF THE GLOVE BOX

Houston-Sconiers argues that the search cannot be justified by officer safety. We hold that the search was justified as a protective sweep based on officer safety concerns.

Officers may conduct a protective sweep if they have reasonable suspicion to believe the defendant may somehow harm the officers. *See Maryland v. Buie*, 494 U.S. 325, 333-34, 110 S. Ct. 1093, 108 L. Ed. 2d 276 (1990).

Houston-Sconiers challenges the trial court's conclusion of law that "[t]he stop was properly expanded to allow Officer Munn to open and look into the glove[ ]box, as he had reasonable articulable suspicion for the presence of weapon in the glove[ ]box." Opening Br. of

Appellant at 1; CP at 177. Officer Munn's concern for officer safety was reasonable in light of the totality of the following findings of fact from the trial court:

1) Brianna's movements at the time of the stop,

2) Tayvion's movements at the time of the stop,

3) known connection between Brianna and known gangmembers [sic],

4) Tayvion's gang involvement and criminal history,

[5]) Brianna's statements related to the glove[ ]box, to include a claim that she could not check the glove[ ]box for her registration, despite it being unlocked, [and]

[6]) Brianna's nervous manner while speaking to the officer.

CP at 176-77. These findings of fact supported the trial court's conclusion of law.

Officer Munn testified that he was concerned that the occupants in the vehicle were reaching for weapons based on their sporadic movements. Cubean's hesitancy to open the glove box even though she stated that it was unlocked also concerned him.

The search was valid on the basis of officer safety because of the furtive movements of the vehicle occupants, the known gang connections and criminal history of the occupants, Cubean's nervous manner when speaking with the officer, and the conversation between Cubean and the officer about opening the glove box. Thus, we hold that officer safety provided a valid exception to the warrant requirement regarding the search of the glove box.

The search of the camouflaged backpack was also justified based on officer safety concerns. Sergeant Johnson had observed Houston-Sconiers take the backpack from another vehicle and put it in the Cadillac. Officer Bradley testified that he had experiences with firearms being carried in backpacks. Because of Officer Bradley's prior experiences with weapons being

carried in backpacks, he had reason to believe that the backpack may contain a firearm in it. Thus, we hold that officer safety also provided a valid exception to the warrant requirement regarding the search of the backpack.

Accordingly, we hold that officer safety concerns provided a justification for searching the glove box and backpack without a warrant.

E. THE OCCUPANTS OF THE VEHICLE WERE LAWFULLY REMOVED

Houston-Sconiers also challenges the officers removal of the occupants from the vehicle. We hold that the occupants were removed from the vehicle for a lawful reason.

As stated above, officers may conduct a protective sweep if they have reasonable suspicion to believe the defendant may somehow harm the officers. *See Buie*, 494 U.S. at 333-34.

Tayvion was removed from the vehicle as part of the protective sweep, as he was sitting in the passenger seat in front of the glove box where Officer Munn suspected a weapon to be, and the officers were aware of his gang affiliation. Cubean was removed in the course of her arrest, even though she ultimately was not arrested. Houston-Sconiers was removed from the Cadillac after the officers discovered the firearm in the glove box. Because these were all valid reasons for removing the occupants of the vehicle, the occupants were lawfully removed and Houston-Sconiers' argument fails. *See Buie*, 494 U.S. at 333-34.

F. CONSENT

Houston-Sconiers argues that valid consent to search the backpack was not given. We hold that Houston-Sconiers' consent was knowingly and voluntarily given.

"Consent is recognized as an independent basis for a warrantless search." *State v. Tyler*, 177 Wn.2d 690, 707, 302 P.3d 165 (2013). For consent to be valid, a person must consent freely

and voluntarily. *State v. O'Neill*, 148 Wn.2d 564, 588, 62 P.3d 489 (2003). If the defendant challenges the free and voluntary character of the consent, the State must show by clear and convincing evidence that the person consented freely and voluntarily, not as a result of duress or coercion. *O'Neill*, 148 Wn.2d at 588; *State v. Smith*, 115 Wn.2d 775, 789, 801 P.2d 975 (1990). Clear and convincing evidence exists when the evidence shows that the ultimate fact at issue is "highly probable." *United States v. Yi*, 704 F.3d 800, 806 (9th Cir. 2013).

Whether consent is free and voluntary is a question of fact that we determine based upon the totality of the circumstances. *State v. Dancer*, 174 Wn. App. 666, 676, 300 P.3d 475 (2013). This analysis looks at: (1) whether the police gave *Miranda* warnings before obtaining consent, (2) the consenting person's degree of education and intelligence, and (3) whether the police advised the consenting person of the right to refuse consent. *Dancer*, 174 Wn. App. at 676. No single factor is determinative. *Dancer*, 174 Wn. App. at 676. The court may also consider other factors, including whether the person was cooperative or initially refused consent, whether law enforcement had to request consent repeatedly, and whether the defendant was restrained. *Dancer*, 174 Wn. App. at 676. Although knowledge of the right to refuse consent is relevant, it is not necessary to a valid consent. *State v. Nelson,* 47 Wn. App. 157, 163, 734 P.2d 516 (1987).

Here, the trial court found, in relevant part, that "[a]fter talking to Cubean, [Tayvion] Johnson and [Houston-Sconiers] about consent, including telling them they could withdraw consent at any time, the officers obtained consent from them to search the Cadillac." CP at 248. The three officers testified that each of the occupants of the vehicle gave their consent to being searched after being given *Miranda* and *Ferrier* warnings. They obtained their consent immediately after discovering the gun in the glove box. Contrary to Houston-Sconiers' contention,

18

there is no evidence that any of the officers told the occupants that if they did not consent to the search, the car would be towed.

There is no evidence that Houston-Sconiers' consent was not given knowingly and voluntarily. The officers gave Houston-Sconiers *Miranda* warnings before obtaining consent and notified him of his right to refuse to consent. Houston-Sconiers did not present any evidence at the CrR 3.6 hearing that his level of education or intelligence in any way affected his ability to understand consent. In fact, he withdrew his consent once the officers found the firearm in his backpack.

We hold that the consent was knowingly and voluntarily given.

## II. INEFFECTIVE ASSISTANCE OF COUNSEL

Houston-Sconiers argues that defense counsel was ineffective at the suppression hearing by failing to argue the discrepancy in the vehicle's window tinting. He claims that defense counsel's failure to pursue a line of questioning with Officer Munn and Sergeant Johnson on whether it was actually possible to see movement through the vehicle's tinted windows rendered his performance deficient. We hold that Houston-Sconiers did not receive ineffective assistance of counsel based on his counsel's performance at the suppression hearing.

Ineffective assistance of counsel is a constitutional error arising from the Sixth Amendment to the United States Constitution and article 1, section 22 of the Washington Constitution. *See State v. Estes*, 188 Wn.2d 450, 457, 395 P.3d 1045 (2017). To prevail on an ineffective assistance claim, the defendant must show: (1) defense counsel's representation was deficient; and (2) the deficient representation prejudiced the defendant. *Estes*, 188 Wn.2d at 457-58. Representation is deficient if, after considering all the circumstances, it falls below an objective standard of

reasonableness. *Estes*, 188 Wn.2d at 458. Prejudice exists if there is a reasonable probability that, except for counsel's errors, the result of the proceeding would have been different. *Estes*, 188 Wn.2d at 458.

Counsel's conduct is not deficient if it can be characterized as a legitimate trial strategy, but the relevant question is not whether counsel's choices were strategic, but whether they were reasonable. *State v. Grier*, 171 Wn.2d 17, 33-34, 246 P.3d 1260 (2011). However, when the record does not show counsel's reasons for making a particular strategic or tactical choice at trial, we are unable to determine whether counsel's decision lacked a legitimate strategic basis. *State v. Linville*, 191 Wn.2d 513, 525, 423 P.3d 842 (2018). And "when 'the claim is brought on direct appeal, the reviewing court will not consider matters outside the trial record.'" *Linville*, 191 Wn.2d at 525 (quoting *State v. McFarland*, 127 Wn.2d 322, 335, 899 P.2d 1251 (1995)).

Assuming, without deciding, that counsel's performance was deficient, Houston-Sconiers fails to establish prejudice. The trial court stated that it would not have changed its ruling even if defense counsel had emphasized the tint issue.

Accordingly, we hold that Houston-Sconiers did not receive ineffective assistance of counsel for his defense counsel's performance at the suppression hearing.

### III.  OFFICER MUNN'S TESTIMONY

Houston-Sconiers argues that the trial court erred by denying his motion to exclude Officer Munn's testimony under ER 615. We hold that the trial court properly denied Houston-Sconiers' motion to exclude Officer Munn's testimony.

Here, the trial court issued an order excluding all witnesses from the courtroom under ER 615. ER 615 states:

> At the request of a party the court may order witnesses excluded so that they cannot hear the testimony of other witnesses, and it may make the order of its own motion. This rule does not authorize exclusion of (1) a party who is a natural person, or (2) an officer or employee of a party which is not a natural person designated as its representative by its attorney, or (3) a person whose presence is shown by a party to be reasonably necessary to the presentation of the party's cause.

ER 615.

Defense counsel moved to exclude Officer Munn's testimony following an allegation from Houston-Sconiers' wife that she overheard Officer Munn discussing his testimony with Officer McNeely outside of the courtroom in the hallway, and that she heard Officer Munn use the word "tints" referring to the tinted windows in the Cadillac. VRP (July 16, 2019) at 550. Houston-Sconiers argues that because window tinting was a point of contention in the trial and went to Officer Munn's credibility, Officer Munn was likely discussing his testimony in violation of the court's order, and therefore, his testimony should have been stricken.

The trial court did not abuse its discretion because Officer Munn did not violate ER 615. Officer Munn was not in the courtroom and did not observe any other witness testimony. The court questioned Officer Munn and the other officer he was alleged to have talked to, and found they credibly denied the allegations that they were discussing testimony related to the trial. We do not review credibility determinations. *State v. Cardenas-Flores*, 189 Wn.2d 243, 266, 401 P.3d 19 (2017).

Accordingly, we hold that the trial court properly denied Houston-Sconiers' motion to exclude Officer Munn's testimony.

IV. UPCS CONVICTION

Houston-Sconiers argues that his conviction for UPCS with a firearm enhancement must be vacated in light of *State v. Blake*. We agree and remand for the trial court to vacate Houston-Sconiers' conviction for UPCS with a firearm enhancement.

While Houston-Sconiers' appeal was pending before this court, our Supreme Court held that Washington's simple drug possession statute, RCW 69.50.4013(1), violates state and federal due process clauses, and therefore, the statute is void. *Blake*, 197 Wn.2d at 195. A defendant cannot be convicted based on a void statute. *See State v. Rice*, 174 Wn.2d 884, 893, 279 P.3d 849 (2012).

Following the *Blake* decision, Houston-Sconiers filed a supplemental brief requesting that we vacate and dismiss his conviction for UPCS with a firearm enhancement. The State filed a supplemental response conceding that we should reverse and remand for the trial court to vacate this conviction. We accept the State's concession. Accordingly, we remand to the trial court to vacate Houston-Sconiers' conviction for UPCS with a firearm enhancement.[11]

SAG

I. CERTIFICATION OF DEFENSE COUNSEL

In his SAG, Houston-Sconiers argues that the trial court erred by failing to require defense counsel to certify that he or she complies with the applicable standard for indigent defense services, and this prejudiced Houston-Sconiers. Houston-Sconiers' argument is based on matters outside

---

[11] Houston-Sconiers also raised issues regarding the exceptional sentence he received, ineffective assistance of counsel at sentencing, the firearm enhancement, and the supervision fee. We do not address these issues related to sentencing because remand for resentencing is required.

of the record. *See State v. McFarland*, 127 Wn.2d 322, 338, 899 P.2d 1251 (1995) (holding that we do not review matters outside the record on direct appeal.). Accordingly, we decline to address this argument.

## II. *MIRANDA*

In his SAG, Houston-Sconiers also argues that the trial court erred by denying his CrR 3.6 motion to suppress because he was not properly given *Miranda* warnings.

State agents are not required to give *Miranda* warnings unless a suspect is subject to custodial interrogation. *State v. Heritage*, 152 Wn.2d 210, 214, 95 P.3d 345 (2004). We review whether a person was in custody for *Miranda* purposes de novo. *State v. Lorenz*, 152 Wn.2d 22, 36, 93 P.3d 133 (2004). The test is an objective one that asks whether a reasonable person in the suspect's position would have felt that his or her freedom was curtailed to the degree associated with a formal arrest. *Berkemer v. McCarty*, 468 U.S. 420, 441-42, 104 S. Ct. 3138, 82 L. Ed. 2d 317 (1984); *see Heritage*, 152 Wn.2d at 218. A routine *Terry* stop does not rise to the level of "custody" for purposes of *Miranda*. *See Berkemer*, 468 U.S. at 439-40; *Heritage*, 152 Wn.2d at 218.

The evidence suggests, and the trial court found, that Houston-Sconiers did not receive full *Miranda* warnings. *See* VRP (April 18, 2019); VRP (April 22, 2019); VRP (April 23, 2019) at 303 ("this court is not finding that Miranda was given to the defendant. In fact, the testimony was inconsistent as to whether Mr. Houston-Sconiers was given Miranda warnings"). However, *Miranda* warnings were not required because Houston-Sconiers was not yet in custody.

Thus, we hold that Houston-Sconiers' SAG *Miranda* claim fails.

CONCLUSION

We affirm Houston-Sconiers' conviction for unlawful possession of a firearm but reverse his conviction for UPCS with a firearm enhancement. We remand for resentencing for the trial court to vacate the UPCS with a firearm enhancement conviction, correct Houston-Sconiers' offender score, and resentence him accordingly.

SUTTON, J.

We concur:

LEE, C.J.

MAXA, J.